**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| **LAURA BERL and SETH BERL, individually and on behalf of all others similarly situated,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 3:24-cv-00066-NKM** |
| **BMW OF NORTH AMERICA, LLC,** | **Demand for Jury Trial** |
| **Defendant.** | |

## CLASS ACTION COMPLAINT

1.     Plaintiffs Laura Berl and Seth Berl (collectively, "Plaintiffs"), by and through counsel, brings this Class Action Complaint against Defendant BMW of North America, LLC ("Defendant" or "BMW"), individually and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsel's investigations, and upon information and belief as to all other matters, as follows:

### I.     NATURE OF THE CASE

2.     Plaintiffs bring this case individually and on behalf of all similarly situated persons residing in Virginia ("Class Members") who purchased or leased a BMW vehicle equipped with a powertrain containing the Rollaway Defect ("Rollaway Defect"). Before purchasing their vehicle, Plaintiffs reviewed materials on Defendant's website and promotional content, which emphasized the safety, reliability, and performance of the BMW X1. Plaintiffs relied on assurances provided during their interactions with dealership staff, including specific representations about the advanced safety features of the Driver's Assistance Professional Package, as well as the overall

1

reliability of the vehicle. Defendant's materials and dealership communications did not disclose the existence of the Rollaway Defect or any related safety risks.

3. Furthermore, Plaintiffs selected this vehicle based on Defendant's explicit and implied representations about its quality and safety, as compared to competing vehicles. Plaintiffs' reliance on these representations and Defendant's omission of material facts about the Rollaway Defect were critical to their decision to purchase the vehicle. Had Plaintiffs been aware of the Rollaway Defect and its associated risks, they would not have sold their 2016 Subaru Crosstrek, purchased the BMW X1 from Defendants, and would have chosen a safer alternative.

4. Defendant designed, manufactured, distributed, advertised, marketed, sold, and/or leased BMW X1 vehicles equipped with the Rollaway Defect from at least 2023 to present in Virginia ("Class Vehicles" or "Vehicles").

5. On information and belief, there are multiple BMW models equipped with this defect and Plaintiff reserves the right to amend the complaint by expanding the Class Vehicle classification.

6. The BMW X1 xDrive28i is equipped with a 2.0-liter twin-turbocharged engine paired with a 7-speed DCT Steptronic transmission. This transmission features fully electromechanical gearshift actuation and electrohydraulic dual-clutch engagement. Despite its advanced design, the DCT has exhibited several operational deficiencies, particularly at low speeds and during transitions between drive, neutral, and reverse gears.

7. Defendant knew its vehicles contained one or more design and/or manufacturing defects, including but not limited to the Rollaway Defect which causes BMW models to roll in a direction opposite of the gear that is selected on a slight incline/decline or uneven road surface, and fail to respond to reasonable throttle input.

2

8.      An automatic transmission is essentially an automatic gear shifter. Instead of manually shifting the gears with a clutch, the automatic transmission shifts gears on its own. The transmission acts as a powertrain to convert the engine's force into a controlled source of power. Accordingly, drivers need a properly functioning automatic transmission to accelerate and decelerate their Vehicles safely and reliably.

9.      The Rollaway Defect, a common design and/or manufacturing defect in BMW powertrains, is a potentially life-threatening safety issue, and BMW has refused to recall and replace the defective powertrains.

10.      On information and belief, possible reasons for the Rollaway Defect include defective electrohydraulic actuation of the dual clutches at low speeds, potentially due to malfunctioning valves, sensors, pistons, and/or other components. Additionally, this defect may result from inappropriate interaction between the engine, transmission, and brake software, leading to insufficient algorithms and safety thresholds. Calibration deficits, such as improper throttle characteristics and dual clutch apply patterns, are also implicated. Furthermore, mechanical defects in dual-clutch parts, including manufacturer flaws, leaking seals, and uneven pistons, may contribute to the rollaway issues.

11.      The Rollaway Defect in the subject vehicle manifests through various hazardous symptoms, which significantly impair its safety and operability. These symptoms collectively endanger the driver, passengers, pedestrians, other road users, and property. This complaint details the specific manifestations of the Rollaway Defect and the associated risks.

12.      One of the primary symptoms of the Rollaway Defect is a pronounced delay in acceleration. Specifically, from a dead stop, there is a delay of 2 to 7 seconds when the gas pedal

3

is pressed in any gear, including reverse. This delay severely impairs the driver's ability to control the vehicle's, acceleration, speed, and responsiveness.

13. Such impairment is particularly dangerous in situations requiring immediate acceleration, such as parking, merging into traffic, navigating intersections, or avoiding sudden obstacles. The inability to promptly accelerate compromises the driver's capacity to respond to dynamic driving conditions, thus increasing the likelihood of causing or avoiding collisions and accidents.

14. Another critical manifestation of the Rollaway Defect is the vehicle's tendency to jerk forward unexpectedly. This sudden and unanticipated movement can lead to a loss of control, posing a significant risk of collisions, particularly in congested or urban driving environments. The unpredictable nature of this jerking motion exacerbates the hazard, as it can catch the driver off guard, cause a detrimental driver intuitive reflex response, and reduce their ability to maintain safe vehicle operation.

15. Additionally, the Rollaway Defect causes the vehicle to roll forward or backward randomly while in gear and awaiting clutch engagement. This uncontrolled rolling is particularly hazardous when the vehicle is stationary but in gear, as it can move unpredictably opposite to the selected drive gear. Such movement poses a threat to pedestrians, other vehicles, property, and the driver, especially on inclines and uneven surfaces. The risk of unintended vehicle movement exacerbates the potential for accidents and injuries or death, highlighting the severe safety implications of this defect.

16. The Rollaway Defect also causes the vehicle to roll on graded services in the direction of the grade independent of the selected drive gear and throttle input. This symptom lasts for an unpredictable amount of time.

4

17.     The symptoms described above collectively compromise the vehicle's safety and operability. The combination of delayed acceleration, unexpected jerking, throttle response issues, and uncontrolled rolling in the direction or opposite direction of the gear selected, creates a driving environment fraught with hazards. These defects undermine the fundamental safety features expected of any vehicle, placing all road users, pedestrians, and property at risk. It is imperative to address and rectify these issues to ensure the vehicle's safe and reliable operation.

18.     Prior to purchasing or leasing Class Vehicles, Plaintiff and other Class Members did not know or have reason to know that the Class Vehicles would have the Rollaway Defect.

19.     Defendant knew the Class Vehicles were and are defective, suffer from the Rollaway Defect, and are not fit for their intended purpose of providing consumers with safe and reliable transportation. Plaintiffs have in their possession a defect bulletin issued by Defendant identifying the Rollaway Defect as "B48 Transversal: Unfavorable Drive-Off Behavior." Despite this knowledge, Defendant failed to disclose these defects to Plaintiffs and Class Members at the time of purchase or lease, or thereafter, putting drivers, passengers, and the public at significant risk.

20.     In addition to the Rollaway Defect, Defendant recently issued a recall related to braking issues in the Class Vehicles. The recall identifies a defect in the braking system that could result in the failure of critical safety features, including automatic braking. This braking defect exacerbates the unsafe conditions created by the Rollaway Defect, as both defects impact the vehicle's ability to respond appropriately to driver input and ensure safe operation. Together, these defects compromise fundamental safety systems, increasing the risk of accidents, property damage, and injury. Despite its knowledge of these defects, Defendant has failed to adequately

5

address these systemic issues, leaving Class Members to bear the burden of operating vehicles that are inherently unsafe.

21.    Had Plaintiff and Class Members known about the Rollaway Defect or braking defect at the time of sale or lease, as well as the associated costs related to the defects, Plaintiff and the Class Members would not have purchased the Class Vehicles and would have chosen different vehicles.

22.    As a result of their reliance on Defendant's omissions and/or misrepresentations, Plaintiff, and other owners and/or lessees of the Class Vehicles have suffered ascertainable loss of money, property, and/or loss in value of their Class Vehicles.

23.    The first priority of an auto manufacturer should be to ensure that its vehicles are safe and operate as intended to prevent or minimize the threat of death or serious bodily harm. In addition, an auto manufacturer must take all reasonable steps to ensure that, once a vehicle is running, it operates safely and its mechanical systems (such as the transmission) work properly. Moreover, an auto manufacturer that is aware of dangerous design defects that cause its vehicles to move without operator intention must not put the vehicle into commerce and must immediately recall all vehicles that have already been sold.

24.    This case arises from Defendant's breach of its obligations and duties, including Defendant's omissions and failure to disclose that, as a result of the Rollaway Defect, Class Vehicles will roll in a direction opposite of the gear that is selected on a slight incline/decline or uneven road surface, and exhibit delayed acceleration when needed.

25.    Defendants marketed their vehicles as safe, reliable, and high-quality products. These representations were not mere puffery or general advertising claims but essential assurances regarding the vehicles' intended use and operation. Plaintiffs and Class Members had

a reasonable expectation that the vehicles they purchased would function safely, reliably, and as represented by Defendants. Defendants' marketing materials explicitly promoted these qualities, creating a clear and justifiable expectation that the vehicles would meet these advertised standards. However, the vehicles sold to Plaintiffs and Class Members failed to meet these standards, as they were neither safe nor reliable.

26.    Defendants held exclusive knowledge and control over the existence of defects in the Class Vehicles. Plaintiffs and Class Members were not obligated to independently investigate or identify these defects to avoid being misled by Defendants' failure to disclose critical information. Furthermore, Plaintiffs and Class Members would have no way of discovering such defect prior to purchasing their vehicles. Defendants' omission of material facts—specifically the existence of a dangerous "rollaway tendency" that directly impacted the vehicles' safety—deprived Plaintiffs and Class Members of the ability to make informed purchasing decisions. This omission constitutes an affirmative misrepresentation or act of concealment, further exacerbating the harm caused by Defendants' defective products.

27.    To the extent warranted by the developing facts, Plaintiff will further supplement the list of Class Vehicles to include additional BMW vehicles that have the Rollaway Defect.

28.    The Rollaway Defect makes Class Vehicles unreasonably dangerous. Because of the Defect, Class Vehicles are likely to suffer serious damage and potentially cause accidents, and there is an unreasonable and extreme risk of serious bodily harm or death to the occupants and others in the vicinity.

## II.    PARTIES

29.    Plaintiffs Laura and Seth Berl are husband and wife and are Virginia citizens who live in Charlottesville, Virginia.

7

30.     Defendant BMW of North America, LLC is a limited liability company organized under the laws of the State of Delaware with CT Corporation System, 4701 Cox Rd Ste 285, Glen Allen, VA, 23060 as its registered agent in Virginia. BMW's principal place of business is at 300 Chestnut Ridge Road, Woodcliff Lake, NJ 07677.

31.     BMW, through its various entities, designs, manufactures, advertises, markets, distributes, and sells and/or leases its vehicles in this District and many other locations in the United States and worldwide. BMW and/or its agents designed, manufactured, and installed the BMW transmissions in the Class Vehicles. BMW also developed and disseminated the owner's manuals, warranty booklets, advertisements, and other promotional materials pertaining to Class Vehicles. The Class Vehicles were designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by BMW of North America, LLC.

32.     BMW's authorized dealerships, like BMW of Charlottesville, are BMW's agents:

a.     BMW enters into franchise agreements with its authorized dealerships as mandated by Virginia law. *See* Va. Code § 46.2-1566 (requiring the Commissioner of the Department of Motor Vehicles to receive copies of any documents affecting dealer franchise agreements and refrain from offering such documents to dealers until receiving approval from the Commissioner). BMW's franchise agreements with its authorized dealerships outline the terms and conditions under which the dealerships can sell and service BMW vehicles. The agreements repeatedly emphasize the dealership's role in taking actions on behalf of BMW, and the importance of dealership compliance with innumerable policies and procedures promulgated by BMW.

b.      BMW's dealerships are authorized to represent the BMW brand and are granted the right to use BMW's trademarks and logos. This association creates a clear link between the dealership and BMW, reinforcing the agency relationship.

c.      BMW establishes training programs and sets standards for dealership employees, including sales representatives. This involvement ensures that dealership staff are knowledgeable about BMW's products and adhere to the company's quality and service standards.

d.      BMW continuously provides advertising materials and guidelines to its dealerships, influencing the way Defendant's vehicles are promoted and creating a cohesive brand image. This level of control further supports the agency relationship.

e.      BMW sets guidelines for warranty service and repairs, and dealerships are required to follow these guidelines. BMW controls the execution of all warranty repairs by its dealers, as it provides training, materials, special tools, diagnostic software, and replacement parts to its dealers, and demands that warranty repairs be performed in strict accordance with its repair guidelines, TSBs, and service messages. BMW promulgates a lengthy dealer warranty manual, which it regularly updates. This manual provides granular detail to dealers regarding warranty services and reimbursement: This level of control over the warranty service and repair process demonstrates the agency relationship between BMW and its dealerships. But the manual excerpted above is only the tip of the iceberg for the control and direction BMW exerts over dealerships' warranty service and repairs. BMW provides a continual stream of guidance and directives to its dealerships through other publications, online communications, and direct contact between

9

f.    BMW remains in continuous communication with its authorized dealerships on nearly every issue conceivable pertaining to advertising, sales, and marketing; warranty repairs and service; brand representation; training and standards; and new and used vehicles.

## III.    JURISDICTION AND VENUE

33.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000.00 exclusive of interest and costs, and Plaintiff and Class Members are citizens of states different from Defendant.

34.    The Court has personal jurisdiction over BMW because, through its business of distributing, selling, and leasing the Class Vehicles in this District, BMW has established sufficient contacts in this District such that personal jurisdiction is appropriate.

35.    Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Venue is proper in this Division under L.R. 2(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this Division. Specifically, Plaintiff purchased their Vehicle, used their Vehicle, experienced the symptoms and malfunctions in their Vehicle which underly their claims, and had their Vehicle serviced by authorized BMW dealerships in this District and Division.

**FACTUAL ALLEGATIONS**

### IV.    THE NATURE OF THE DEFECT

36.    BMW has designed, manufactured, distributed, advertised, marketed, sold, and/or leased its vehicles in the United States for decades.

37.    BMW has touted the superiority and class of its vehicles, particularly in the quality and safety of its engineering.

38.    In terms of safety, BMW states that the X1 is a true leader in safety with the most advanced safety features and onboard driving technology.



39.    BMW further highlights its "most advanced safety features. The BMW X1 comes standard with Active Driving Assistant, which includes multiple safety systems like Frontal Collision Warning with City Collision Mitigation, Lane Departure Warning, and Active Blind Spot Detection to provide extra protection for you and your passengers on the road."



40.    BMW further claims that the X1 is "One step ahead. The BMW X1 goes above and beyond to keep you and your passengers protected with safety features including standard

11

Active Blind Spot Detection, Frontal Collision Warning with City Collision Mitigation, and Lane Departure Warning."[1]

41.    BMW's X1, "comes with xDrive, BMW's intelligent all-wheel drive system, equipped as standard. This technology powers all four wheels, and automatically counteracts slip in reduced traction areas for a more controlled driving experience."[2]

42.    BMW's X1 is equipped with a 7-speed automatic dual clutch transmission on both X1 models, the M35i and xDrive28i.

PERFORMANCE

PACK A PUNCH

A 2.0-liter BMW TwinPower Turbo inline 4-cylinder engine drives the BMW X1, turning out 241 horsepower. In the new X1 M35i, the 2.0-liter BMW M TwinPower Turbo inline 4-cylinder engine yields 313 horsepower. Shift smoothly with the 7-speed automatic dual clutch transmission, standard on both models.

43.    BMW also offers extended warranty coverage for multi-coverage protection for seven years or 100,000 miles, whichever occurs first. This extended warranty coverage includes the transmission and all internal parts, clutch cover, seals and gaskets, torque converter, transfer case (including all internal parts), transmission case, and transmission mounts.[3]

---

[1] https://www.bmwusa.com/future-vehicles/x1-luxury-sav.html/1000 (last accessed on Aug. 27, 2024).

[2]    https://www.bmwusa.com/vehicles/x-models/x1/suv/overview.html#performance    (last accessed on May 30, 2024).

[3] https://www.bmwusa.com/financial-services/protection-program.html (last viewed May 30th, 2024)

## Vehicle Service Contracts (VSC)

Coverage for your BMW should go above and beyond. VSC expands the coverage of your vehicle for up to 7 years, or 100,000 miles, and offers options to customize the level of protection needed. In addition, BMW guarantees unmatched quality of care with all repairs completed with 100% Original BMW parts at an authorized repair facility.

Obligor: BMW of North America, LLC
300 Chestnut Ridge Road Woodcliff
Lake, NJ 07677-7731, 800-831-1117.

44. The levels of coverage include the Platinum or Powertrain Warranty.

**Platinum**

Available for New, Pre-Owned, Plug-In Hybrid, Electric, and Certified Pre-Owned Vehicles

Comprehensive coverage for most major components and exclusive protection offerings.

**Powertrain**

Available for New, Pre-Owned, and High Mileage Vehicles

Extensive coverage of many drivetrain components and limited coverage for many other parts.

45. As a result of the Rollaway Defect, and the malfunctions it causes in the Vehicles, Plaintiffs and Class Members have stated that they do not feel safe driving the Class Vehicles in normal traffic conditions.

46. BMW has internally identified and acknowledged the Rollaway Defect and ascertained that the root cause is unfavorable engine and transmission calibration.

## V.    PLAINTIFFS' EXPERIENCE

### A.    Plaintiffs Seth and Laura Berl

47. Seth Berl sought to purchase a safe and reliable vehicle for his newlywed wife, Laura. In making this decision, Seth relied heavily on BMW's advertisements, promotional materials, and website representations, which emphasized the 2023 BMW X1 xDrive28i as a high-quality vehicle with advanced safety features, including the Driver's Assistance Professional package. BMW's materials and dealership staff portrayed the vehicle as offering superior safety and reliability, consistent with BMW's reputation for excellence. In reliance on these representations, Seth and Laura sold Laura's highly reliable 7-year-old Subaru Crosstrek—which had no issues beyond routine maintenance—one day before taking delivery of the new BMW.

48. At the time of Seth and Laura's purchase, Defendant was aware that the 2023 BMW X1 xDrive28i suffered from the Rollaway Defect, referred to by Defendant as "B48 Transversal:

Unfavorable Drive-Off Behavior," a dangerous issue that impacted the vehicle's safety and reliability. Despite this knowledge, BMW and its sales representatives failed to disclose the defect or its risks to Seth and Laura during the purchase process. Neither the promotional materials, advertisements, nor the dealership staff mentioned the Rollaway Defect or the safety concerns it created. Prior to Seth and Laura's purchase of their X1, BMW noted the following about the Rollaway Defect in a presentation:

Summary

- U11 acceleration behavior from stand-still or slow speeds does not meet customer expectation.
- Drive-off from MSA stop unfavorable.

Root Cause

- Unfavorable engine and transmission calibration.

Service Solution.

- Planned series of solutions and mitigation measures

49.    In May and June 2023, Seth and Laura visited BMW of Charlottesville on numerous occasions to research and evaluate replacement options for Laura's 2016 Subaru Crosstrek. During these visits, Seth and Laura met with Malik Salisbury, a sales employee, and Rick Martens, a sales manager. Seth and Laura test drove a BMW X3. Seth and Laura looked at a BMW X1 at the dealership that had already been sold, and Malik informed them of the X1's features, including safety features. Seth and Laura looked online at the X1's safety features. Malik researched the Driver's Assistance Professional package and informed Laura and Seth of the features included in that package. Malik also briefed Seth and Laura on the iDrive 8 infotainment system and features. Seth and Laura asked about iDrive 9 infotainment system and features, which was scheduled to be released in the model year 2024 X1. Malik advised Seth and Laura that waiting

14

for the iDrive 9 infotainment system and features did not make sense because iDrive 9 was similar to iDrive 8. Malik showed Seth and Laura the X1 inventory available at various BMW dealerships and en route to BMW of Charlottesville. Seth and Laura also discussed prices and financing options. During their visits to BMW of Charlottesville and the BMW website, Seth and Laura repeatedly received assurances about the industry leading safety capabilities of BMW generally and the X1 specifically. Seth and Laura reasonably accepted these assurances as true and relied upon them in ultimately deciding to purchase an X1.

50.     Prior to deciding to purchase an X1, Seth and Laura painstakingly reviewed content on the BMW website, reviews of the X1 in such publications as Consumer Reports and Car & Driver, compared safety features, and test drove different vehicle makes and models. Mercedes GLA, Mercedes GLC, Volvo XC40, Volvo XC60, Audi Q3, Audi Q5, Subaru Outback, Mazda CX-50, and the BMW X3. Unfortunately, no BMW X1s were available to test drive due to supply shortages.

51.     Seth and Laura test drove a BMW X3 and liked the way it drove. Based on that test drive and the numerous representations about X1 performance and safety from BMW of Charlottesville and the BMW website.

52.     In late June 2023, Seth and Laura "built" a customized X1 with optional vehicle safety and other features on the BMW website and sent their "build" to Malik to place an order for their X1. Seth and Laura eventually contacted Malik to update a trim package before the X1 they intended to purchase went into production.

53.     In July 2023, BMW issued a major software update for the X1.

54.     On August 15, 2023, the X1 Seth and Laura ordered arrived at the Port of Baltimore and was supposed to be transported to BMW of Charlottesville.

15

55.    On August 28, 2023, Stuart Drake, the General Manager of BMW of Charlottesville, informed Seth and Laura that the dealership was working to get the X1 in stock by the end of the month.

56.    In early September 2023, Malik informed Seth and Laura that the X1 they ordered was damaged at a process facility and failed quality inspection because of damage and software issues. Seth and Laura were informed that it would take approximately five weeks to ship a new bumper, have the bumper installed, and pass the quality control process at the processing facility.

57.    On September 13, 2023, the X1 Seth and Laura purchased arrived at BMW of Charlottesville. On September 14, 2023, Seth and Laura finalized their purchase and financing of the X1. On September 16, 2023, Seth and Laura took delivery of the X1.

58.    Seth and Laura relied on BMW's omissions and misrepresentations in deciding to purchase and operate the vehicle. They reasonably believed that the BMW X1 would perform safely and as warranted. At no time before the purchase did BMW or its agents, dealers, or representatives inform Seth and Laura about the Rollaway Defect.

59.    Just three days after taking delivery of the vehicle, Seth and Laura experienced the dangerous rollaway tendency for the first time. The vehicle exhibited a propensity to roll in the opposite direction of the selected gear on inclines and declines, often failing to respond to reasonable throttle input.

60.    On September 19, 2023, with only 30 miles on the odometer, Seth brought the vehicle to BMW of Charlottesville for service. The dealership performed a software update and recalibrated the dual clutch system. However, these efforts failed to resolve the Rollaway Defect.

61.    Over the next several months, Seth and Laura continued to experience rollaway episodes at a rate of about 2-3 times per week, posing a significant safety risk.

62.     On December 7, 2023, with approximately 900 miles on the vehicle, they returned to the dealership for a second service visit. Despite another software update, the Rollaway Defect was not resolved.

63.     On December 16, 2023, Seth and Laura returned the vehicle to the dealership for a third time, providing both sets of keys and expressing their intention to no longer take or retain possession of the defective vehicle. They expected BMW to either refund them completely or provide a different model replacement vehicle with the same or better safety features. Despite these efforts, the rollaway issue remained unresolved, the vehicle has been at the dealership for over 240 days and remains at the dealership as of the filing of this complaint.

64.     Laura and Seth brought their X1 to BMW of Charlottesville on three separate occasions, and the service department was unable to repair the Rollaway Defect. The service department told Laura and Seth that there was no currently available repair that was effective to remediate the Rollaway Defect. BMW received contemporaneous, detailed notice of Laura and Seth's complaints about the Rollaway Defect and the service department's inability to remediate that defect.

65.     One of the loaner vehicles provided to Plaintiffs exhibited the Rollaway Defect, as documented in two videos.

66.     Seth and Laura have not received the benefit of their bargain. Instead, the defective BMW X1 xDrive28i has caused them significant distress, inconvenience, and safety concerns. They continue to await a resolution from BMW that addresses the financial and emotional burdens imposed by the unsafe vehicle and BMW's inaction.

## VI.    CLASS ACTION ALLEGATIONS

A.    <u>Class Members</u>

67.    Class Members are at least in the hundreds and have experienced similar problems with their Class Vehicles as a result of the Rollaway Defect. Numerous complaints have been made to NHTSA, BMW dealerships, and through online forums by other BMW owners who have experienced the Rollaway Defect. These complaints include descriptions of the vehicle rolling unexpectedly while in gear (many times in the opposite direction), delays in acceleration, and sudden jerking movements. Despite these widespread reports, BMW has not taken sufficient action to remedy the defect or to adequately inform consumers about the potential dangers associated with their vehicles before and after purchase. As a result, Class Members, like the Plaintiffs, have been deprived of the safe and reliable transportation they were promised and have suffered financial loss, inconvenience, emotional distress, and safety concerns.

68.    An examination of NHTSA complaints illustrates the Class Members' experiences with the Rollaway Defect and its potential danger (note that spelling and grammar mistakes remain as found in the original).

> <u>NHTSA Complaint dated August 4, 2024</u>: The auto start software will turn the engine off when the car is still rolling. I can be rolling 2-4 MPH and the engine will just turn off. There's a huge delay after the engine restarts for power to continue. There is no way to permanently turn off this feature. If you are making a left turn across traffic you can be in a situation where the car will allow you to roll into oncoming traffic with the engine off. And as you press the gas, nothing happens. It happens randomly so there's no way to "learn" how the car behaves and anticipate it. In addition, when the engine power does resume, it jolts forward and is sudden. The dealer has said there is nothing they can do as it's BMW USA software. There's no warning and no way to know that the engine is off. The software will only tell you when the car is at a full stop. Even then, the only indication is the small "ready" words. This is very easily reproducible by driving through several stop signs in personal mode. (ID No. 2012598)
>
> <u>NHTSA Complaint dated July 26, 2024</u>: Traveling about 35mph with no cars around, the brakes applied, no throttle response, and little steering.  Warning lights

illuminated and couldn't move car until turned off ignition and restarted.  Dealer showed no codes and shows no record of it occurring.  This symptom mirrors a recall on last years model, but not yet on 2024's.  BMW says there's nothing more they can do but we are afraid to drive car because it's a guaranteed accident waiting to happen. (ID No. 2012597)

NHTSA Complaint dated March 1, 2024: The auto start/stop on this car is super slow and will turn off the engine before the car comes to a complete stop. It causes confusion at intersections because of the slow getaway and has nearly caused several collisions. For instance, last week I was turning left at an intersection. The left turn was a yield, so i am turning across oncoming traffic. This is the usual intersection in my city. I did not come to a complete stop and started to turn left. I left plenty of space to the oncoming traffic. To my surprise, the engine had turned off and I sat in the intersection pressing the gas pedal to no power. I essentially coasted most of the way through the intersection before the power came back. By that point, I was pushing the gas so hard that when the engine started, I nearly lost control because of the sudden jolt of acceleration while turning. This has happened multiple times and puts drivers of the X1 and others at risk. I've owned and driven hundreds of cars with auto start/stop and this has to be the worst by far. I cannot understand why the engine will turn off before the car comes to a stop. This is more typical of a mild-hybrid drivetrain, except this car does not have an electric engine. It happens with no consistency, so there's no way to adapt driving style. There is only one way to disable the start/stop, and it's deep within the menus (several button clicks on a touch screen-only display), and then it only disables it for the current trip. The dealer has mentioned it's not great but has no way to fix as it's a software problem. Zero warning lamps. (ID No. 1975151)

NHTSA Complaint dated October 26, 2023: The car has a serious turbo lag. When I stepped on the gas it would take a few seconds for the car to move. I was very nervous driving it, as it was difficult to judge when I could enter or cross a stream of traffic safely. This is a serious safety issue. The dealership offered to come to my home with a loaner and have one of their employees accompany me while I drove the car to illustrate the issue. The person readily agreed several times there was an issue in the way the turbo or transmission was functioning. He loaded the car on the flatbread to the dealership and left me with a loaner. After checking out the issue with my brand new car the dealer agreed it was a problem. They said they would check for a software update, which they did and installed it. They held it again overnight to test it the next day after the software update. The service manager advised that the software update did not fix the issue, and BMW told them that the car was designed to work that way. After hearing this I looked online for people with the same issue, and I readily found several examples including a person that regularly reviews new cars in video and said the turbo lag was dangerous and he would not be surprised if there was a recall in the future. How can the service department see a problem and the manufacturer say it was designed to work that way? If so, customer should be advised, hey when you step on the gas the car may not move for a few seconds! (ID No. 11559766)

NHTSA Complaint dated October 26, 2023: This vehicle has on numerous times has had delayed acceleration from a stop or rolling stop. The hesitation is random and unpredictable. The vehicle will be unresponsive for a second or two and then a surge of acceleration will jolt the vehicle forward. This causes an unsafe situation in which defensive maneuvering can be delayed. Accelerating from a stop sign or traffic light can become dangerous due to the significant lag between stepping on the gas pedal and the movement of the vehicle. (ID No. 1938330)

NHTSA Complaint dated April 1, 2023: Email sent to BMW describing a hesitancy or delay on acceleration from a dead stop: I have attached a link below to a blog from January, 2023, describing this problem on 2023 BMW X1; it includes a description of the issue on a video review of this car by Consumers Report. Apparently, this has not been corrected. My new 2023 X1 has this significant and dangerous problem. I was at the dealer service department for 2 1/2 hours this morning and they claimed not to be aware of the problem, although the technician did recognize the hesitancy. They also had no repair or correction from BMW. That is inexcusable. A second delay on accelerating from a stop making a turn onto or merging onto a highway, could result in a collision. I assume that BMW is waiting for enough reports of that happening before doing something about it. I am not interested in explanations or excuses. I assume the it is due to the engine stop/start mechanism. I want it corrected. I am leaving on a road trip in 2 weeks and am afraid to take this car on the trip. I realize that if I turn off the stop/start mechanism on each startup or drive in Sport mode, and the hesitancy does not occur. That is not an acceptable alternative for a $58,000, BMW X1, especially for a recognized defect in the car's manufacture or software that has been known for at least 10 months. I need to have it fixed. [XXX] cc: California Department of Consumer Affairs INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6) (ID No. 1932514)

NHTSA Complaint dated May 17, 2023: This report is for a 2023 BMW x1 with a dual clutch transmission. I was driving on a four lane road with a 35 mph speed limit and attempting to make a left turn. I was stopped at the light waiting the oncoming traffic to clear to make the left turn (from the left most of the two lanes). There was a significant delay in the car moving after pressing the accelerator allowing for the oncoming traffic to get within a dangerous range before the car finally moved. The car did make the left turn quickly, but the delay in initiating the turn was quite notable. The care was in the "Personal" drive mode and the auto hold function was not activated, nor was the auto off engaged when stopped. I don't use the paddle shifters and the car was in Drive. The engine was running when the accelerator was pressed. I have noticed this delay to accelerate at other times with the car is in first gear (moving from a slowed or stopped position), but I have not yet reported to the dealer (but have seen discussion of this issue on online owners forums). The delay doesn't happen when the car is moving or beyond first gear. Acceleration is not impacted once out of first gear. (ID No. 11529795)

69.    Plaintiffs bring this lawsuit individually and as a class action on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

70.    The Class is defined as:

All persons residing in Virginia who formerly or currently own(ed) or leased one or more 2023 BMW X1 vehicles.[4]

71.    The Subclass is defined as:

All persons in Virginia who formerly or currently own(ed) or leased one or more 2023 BMW X1 vehicles with a Rollaway Defect who received personal property tax relief under Virginia law for their vehicle(s).[5]

72.    Plaintiff reserves the right to amend or modify the Class and Subclass definitions after he has had an opportunity to conduct discovery.

73.    Numerosity:  Fed. R. Civ. P. 23(a)(1). The Class and Subclass are so numerous that the joinder of all members is unfeasible and not practicable. While the precise number of Class and Subclass Members has not been determined at this time, Plaintiff is informed and believes at least hundreds of individuals have purchased or leased the Class Vehicles in Virginia and hundreds of such individuals fall within the Subclass.

74.    Commonality: Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class and Subclass, which predominate over any questions affecting only

---

[4] Plaintiff reserves the right to amend or modify his Class and Subclass definitions to include or exclude model years of Vehicles experiencing the Rollaway Defect after they have an opportunity to conduct discovery related to changes made to the X1 and other BMW models in each model year, if any.

[5] These vehicles are referred to hereafter as "Subclass Vehicles."

21

individual Class and Subclass Members. These common questions of law and fact include, without limitation:

a.      whether the Class Vehicles and their powertrains are defectively designed or manufactured such that they are not suitable for their intended use;

b.      whether the fact that the Class Vehicles suffer from the Rollaway Defect would be considered material to a reasonable consumer;

c.      whether, as a result of BMW's concealment or failure to disclose material facts, Plaintiff and Class Members acted to their detriment by purchasing Class Vehicles manufactured by BMW;

d.      whether BMW was aware of the Rollaway Defect;

e.      whether the Rollaway Defect constitutes an unreasonable safety risk;

f.      whether BMW breached express and/or implied warranties with respect to the Class Vehicles;

g.      whether BMW violated consumer protection laws for failing to notify the Rollaway Defect to Plaintiff and Class Members; and

h.      whether BMW has a duty to disclose the defective nature of the Class Vehicles and the Rollaway Defect to Plaintiff and Class Members.

75.     <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of Class and Subclass Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

76.     <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of BMW's unlawful and wrongful conduct.

22

A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claim high and would therefore have no effective remedy at law. Because of the relatively small value of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for BMW's misconduct. Absent a class action, Class Members will continue to incur damages, and BMW's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

## VII.  DEFENDANT KNEW OR SHOULD HAVE KNOWN OF THE ROLLAWAY DEFECT PRIOR TO PLAINTIFF'S PURCHASE

### A.  BMW Knew of, Acknowledged, and Yet Failed to Remedy the Rollaway Defect.

77.    BMW knew or should have known about the Rollaway Defect well before Plaintiffs and Putative Class Members purchased their vehicles. Internal documents, including but not limited to meeting minutes, briefing materials, and dealership PowerPoints, demonstrate that BMW knew and had been made aware of the defect. BMW's internal communications and technical bulletins, intended for dealership service departments, acknowledge the existence of the defect identified as "B48 Transversal: Unfavorable Drive-Off Behavior" and provide guidance on temporary and/or useless measures to address customer complaints. BMW has already acknowledged "unfavorable engine and transmission calibration" as the "root cause" of the Rollaway Defect.

78.    BMW failed to disclose this critical safety issue to the public, leaving consumers uninformed about the risks associated with their vehicles. BMW's decision to withhold this

23

information and not initiate a recall nor effective remedy reflects a deliberate choice to prioritize its corporate interests over the safety and well-being of its customers and the public.

## CAUSES OF ACTION

### Count One—Breach of Express Warranty

U.C.C. § 2-313
(Va. Code § 8.2-313)
(Plaintiffs, individually, and on behalf of the Class)

79.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

80.    Plaintiffs bring this cause of action on behalf of the Class.

81.    Virginia has adopted the Uniform Commercial Code, including U.C.C. § 2-313, which covers express warranties. Va. Code § 8.2-313. That section provides that "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." U.C.C. § 2-313(1)(a). Further, "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the good shall conform to the description." *Id*. § 2-313(1)(b).

82.    Plaintiffs and Class Members are "buyers" within the meaning of each applicable warranty statute.

83.    The Class Vehicles are "goods" within the meaning of each applicable warranty statute.

84.    BMW is a "manufacturer" and/or "seller" within the meaning of the warranty statutes.

85.    Plaintiffs and Class Members purchased or leased BMW vehicles that were expressly warranted to be free of defects in materials or workmanship. These vehicles were equipped with a defective transmission, powertrain, and/or software that caused the Rollaway Defect.

86.    BMW marketed, sold, leased, and/or distributed the Class Vehicles, and Plaintiffs and Class Members purchased or leased these vehicles in reliance on BMW's express representations and warranties.

87.    BMW made express warranties to Plaintiffs and Class Members, including but not limited to its New Vehicle Limited Warranty, which warranted the Class Vehicles "against defects in material or workmanship" for a specified period.

88.    The New Vehicle Limited Warranty was an integral part of the basis of the bargain when Plaintiffs and Class Members purchased or leased the Class Vehicles. Plaintiffs and Class Members reasonably relied on these warranties in purchasing or leasing the Class Vehicles.

89.    In the course of selling and leasing the Class Vehicles, BMW expressly "warrant[ed]" the Class Vehicles "against defects in material or workmanship to the first retail purchaser, and each subsequent purchaser."

90.    The Rollaway Defect, which is a dangerous safety hazard, was covered under BMW's New Vehicle Limited Warranty. However, BMW has failed and refused to repair the defect adequately or provide a reasonable remedy.

91.    BMW breached its express warranties by failing to repair the Rollaway Defect and by failing to provide a vehicle that conformed to the promises and affirmations made in its express warranties.

25

92.     Furthermore, the express warranties to repair defective parts fail in their essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class Members whole and because BMW has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

93.     Accordingly, recovery by Plaintiffs and the Class is not limited to the express warranties of repair to parts defective in materials or workmanship, and Plaintiff seeks all remedies as allowed by law.

94.     Plaintiffs were not required to notify BMW of its breach and/or was not required to do so because affording BMW a reasonable opportunity to cure any breach of written warranty would have been futile.

95.     To the extent notice is required, Plaintiffs and Class Members provided BMW with notice of the Rollaway Defect through service visits, direct communications, and complaints lodged with authorized dealerships.

96.     As to Plaintiffs, when BMW of Charlottesville serviced the X1 for the Rollaway Defect, the service department sent detailed contemporaneous notice of the Plaintiffs' complaints about the Rollaway Defect and attempted repair efforts directly to BMW. BMW received this detailed contemporaneous notice.

97.     BMW also had constructive notice through numerous customer complaints, warranty claims, and internal defect bulletins, including the acknowledgment of the Rollaway Defect as "B48 Transversal: Unfavorable Drive-Off Behavior."

98.     Plaintiffs and other Class members are entitled to statutory damages and other legal and equitable relief including, at their election, the purchase price of or a buyback of their BMW vehicles, or the overpayment or diminution in value of their Class Vehicles.

26

99. Plaintiffs and Class members are also entitled to costs and reasonable attorneys' fees.

**<ins>Count Two—Breach of Implied Warranty of Merchantability</ins>**

U.C.C. § 2-314
(Va. Code § 8.2-314)
(Plaintiff, individually, and on behalf of the Class)

100. Plaintiffs incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

101. Plaintiffs bring this cause of action individually and on behalf of the Class.

102. Virginia has adopted the Uniform Commercial Code, including U.C.C. § 2-314, which covers the implied warranty of merchantability. Va. Code § 8.2-314 That section provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." U.C.C. § 2-314(1).

103. BMW is and was at all relevant times a merchant with respect to the Class Vehicles.

104. BMW was and is in actual or constructive privity with Plaintiff and all Class Members.

a. Plaintiffs have and continue to have sufficient direct dealings with BMW and/or its authorized dealers, franchisees, representatives, and agents to establish any required privity of contract. BMW's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed for and intended to benefit only the ultimate purchasers and lessees of the Class Vehicles, i.e., Plaintiffs and Class Members.

27

b.      Privity is not required to assert this claim because Plaintiffs and the Class

Members are the intended consumers of the Class Vehicles and intended third-party

beneficiaries of contracts between BMW and its dealers, franchisees, representatives, and

agents.

c.      By extending express written warranties to end-user purchasers and lessees,

BMW brought itself into privity with Plaintiff and all Class Members.

105.    Pursuant to Va. Code § 8.2-314, the Class Vehicles owned or leased by Plaintiffs

and Class Members were defectively designed and manufactured and posed a serious and

immediate safety risk to consumers and the public.  The Class Vehicles were subject to an implied

warranty of merchantability, did not comply with the warranty in that they were defective at the

time of sale, and as a proximate result of the Defect the Plaintiff and Class Members sustained

damages.

106.    The Class Vehicles left BMW's facilities and control with the Rollaway Defect

caused by defective design incorporated into the manufacture of the Class Vehicles. The Rollaway

Defect puts the consumers at a safety risk upon driving the Class Vehicles. At all times relevant

hereto, there was a duty imposed by law which requires that a manufacturer or seller's product be

reasonably fit for the ordinary purposes for which such products are used, and that the product be

acceptable in trade for the product description. This implied warranty of merchantability is part of

the basis of the bargain between BMW, on the one hand, and Plaintiff and Class Members, on the

other.

107.    Notwithstanding its duty, at the time of delivery BMW breached the implied

warranty of merchantability in that the Class Vehicles powertrains were defective and posed a

serious safety risk at the time of sale, would not pass without objection, are not fit for the ordinary

28

purposes for which such goods are used, and failed to conform to the standard performance of like products used in the trade.

108. BMW has not validly disclaimed, excluded, or modified the implied warranties or duties described above, and any attempted disclaimer or exclusion of the implied warranties was and is ineffectual.

109. BMW knew, or should have known, that the Class Vehicles posed a safety risk and contained the Rollaway Defect, and knew, or should have known, of these breaches of implied warranties prior to sale or lease of the Class Vehicles to Plaintiff and Class Members.

110. Plaintiffs and Class Members used the Class Vehicles in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of BMW or by operation of law in light of BMW's unconscionable conduct.

111. BMW had actual knowledge of, and received timely notice regarding, the Rollaway Defect at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy.

112. In addition, BMW received, on information and belief, numerous consumer complaints and other notices from customers advising of the Rollaway Defect in the Class Vehicles.

113. By virtue of the conduct described herein and through this Complaint, BMW breached the implied warranty of merchantability.

114. As a direct and proximate result of BMW's breaches of its implied warranties, Plaintiff bought the Class Vehicles without knowledge of the Rollaway Defect or their serious safety risks and purchased unsafe products which could not be used for their intended use.

115.    As a direct and proximate result of BMW's breach of its implied warranties, Plaintiff and Class Members have suffered economic damages, including loss attributable to the diminished value of their Class Vehicles, loss of use of their Class Vehicles and other tangible property, as well as the monies spent and to be spent to repair the Rollaway Defect and/or replacement costs for the purchase of a safe vehicle. BMW was unjustly enriched by keeping the profits for its unsafe products while never having to incur the cost of repair, replacement or a recall.

116.    Plaintiffs and other Class members are entitled to statutory damages and other legal and equitable relief including, at their election, the purchase price of or a buyback of their BMW vehicles, or the overpayment or diminution in value of their Class Vehicles.

117.    Plaintiffs and Class members are also entitled to costs and reasonable attorneys' fees.

### Count Three—Virginia Consumer Protection Act

(Va. Code §§ 59.1-196 *et seq.*)
(Plaintiff, individually, and on behalf of the Subclass)

118.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

119.    Plaintiffs bring this cause of action individually and on behalf of the Subclass.

120.    The sale and offering for sale of the Vehicle to Plaintiff is a "consumer transaction" under the Virginia Consumer Protection Act, Va. Code §§ 59.1-196 *et seq.* ("VCPA"). Va. Code § 59.1-198. Each sale and offering for sale of the Subclass Vehicles to the Subclass Members was a "consumer transaction" under the VCPA. *Id.*

121.    The Vehicle and Subclass Vehicles are "good[s]" under the VCPA. *Id.*

122.    At all times relevant, BMW was a supplier under the VCPA. *Id.*

123.    The warranty service and repairs of the Vehicle provided to Plaintiff through BMW's authorized dealerships constitute a "consumer transaction" under the VCPA. *Id.* The warranty service and repairs of the Subclass Vehicles provided to the Class Members through BMW's authorized dealerships constitute a "consumer transaction" under the VCPA. *Id.*

124.    The warranty service and repairs of the Vehicle and Class Vehicles through BMW's authorized dealerships are "services" under the VCPA. *Id.*

125.    Defendant's conduct, as described herein, took place within the state of Virginia and constitute prohibited practices in violation of the VCPA.

126.    Defendant violated the VCPA in its sale and offering for sale of the Subclass Vehicles, as well as in its warranty service and repairs of the Subclass Vehicles, both directly and through its authorized dealerships acting as Defendant's agents, by engaging in the following false and misleading practices:

A.    Misrepresenting through advertisements, promotional materials, and dealership assurances that the Subclass Vehicles would operate safely and effectively, despite Defendant's knowledge that the Subclass Vehicles suffered from the Rollaway Defect;

B.    Misrepresenting through marketing and dealership communications that the Subclass Vehicles would operate safely and effectively, while failing to disclose that the Rollaway Defect created dangerous and unpredictable vehicle behavior;

C.    Misrepresenting that the Subclass Vehicles were equipped with functional, non-defective, and safe forward and reverse systems, despite Defendant's awareness of the Rollaway Defect and its impact on safety;

31

D.      Misrepresenting that the Rollaway Defect and its resulting issues, such as sudden uncontrolled forward and reverse movement of vehicles, did not impair the use, safety, and/or market value of the Subclass Vehicles to Subclass Members, when in fact these issues rendered the vehicles unsafe and significantly diminished their value;

E.      Misrepresenting that consumer reported symptoms of the Rollaway Defect were "perceived" or "imagined" issue that did not impair the use, safety, and/or market value of the Subclass Vehicles to Subclass Members;

F.      Failing to adhere to and honor the terms of the warranty(ies) it provided for the Subclass Vehicles;

G.      Misrepresenting through warranty service and repair records that service and repairs provided for the Subclass Vehicles would resolve the Rollaway Defect, when Defendant knew or should have known that such repairs were insufficient or ineffective;

H.      Misrepresenting through advertisements and communications that the Subclass Vehicles were safe to operate, even though Defendant was aware that the Rollaway Defect posed a significant safety hazard to consumers and others on the road;

I.      Advertising the Subclass Vehicles as operating with smooth and responsive acceleration and shifting, despite Defendant's knowledge that the Rollaway Defect caused abrupt, uncontrolled forward and reverse vehicle movement, and failing to disclose this defect in its promotional materials; and

J.      Advertising and offering for sale the Subclass Vehicles without clearly and unequivocally indicating in its advertisements and offers for sale that the Subclass Vehicles were defective, irregulars, imperfects, and/or not first class.

127.    BMW's conduct, as detailed in this Complaint, violated the following subsections of the VCPA:

A.    Va. Code § 59.1-200(A)(5): BMW misrepresented that the Subclass Vehicles would operate safely and effectively, promoting their safety and reliability while knowing that the Rollaway Defect caused abrupt, uncontrolled vehicle movement. These misrepresentations directly contradicted the actual performance of the vehicles;

B.    Va. Code § 59.1-200(A)(6): BMW misrepresented the safety and functionality of the Subclass Vehicles in its marketing and communications by failing to disclose the Rollaway Defect, which caused the vehicles to roll in unintended directions and posed significant safety risks to drivers, passengers, and pedestrians;

C.    Va. Code § 59.1-200(A)(7): BMW advertised and sold the Subclass Vehicles as having functional and non-defective powertrains and safety systems, while omitting material facts about the Rollaway Defect and its impact on safety, reliability, and market value, thereby misleading consumers;

D.    Va. Code § 59.1-200(A)(8): BMW misrepresented that its warranty repairs would adequately address the Rollaway Defect when it knew or should have known that the repairs performed were insufficient and would not resolve the defect, leaving consumers with unsafe and unreliable vehicles;

E.    Va. Code § 59.1-200(A)(10): BMW failed to disclose material facts about the Rollaway Defect in its advertisements and promotional materials, knowing that this omission would mislead consumers about the safety, reliability, and value of the Subclass Vehicles;

33

F.      Va. Code § 59.1-200(A)(14): BMW engaged in deceptive practices by advertising the Subclass Vehicles as first-class and defect-free while failing to disclose their known defects, including the Rollaway Defect, which rendered the vehicles unsafe and unreliable; and

G.      Va. Code § 59.1-200(A)(17): BMW knowingly and willfully engaged in conduct designed to mislead and deceive consumers, including plaintiffs and subclass members, about the safety and reliability of the Subclass Vehicles by failing to disclose the Rollaway Defect and by continuing to market and sell vehicles with this defect without appropriate warnings or remedies.

128.    BMW knew of the Rollaway Defect prior to the first retail sale of the BMW X1 in Virginia. However, BMW allowed and continued to allow unsuspecting new and used car purchasers to buy or lease the Subclass Vehicles and allowed them to continue driving dangerous vehicles.

129.    BMW owed Plaintiff and the Subclass Members a duty to disclose the true safety and reliability of the Subclass Vehicles and/or the defective Transmissions installed in them before purchase because BMW:

a.      BMW possessed exclusive knowledge of the Rollaway Defect and its related safety risks, as evidenced by internal defect bulletins identifying the issue as "B48 Transversal: Unfavorable Drive-Off Behavior" and consumer complaints received before the sale of the Subclass Vehicles. BMW was uniquely positioned to know that the defect caused vehicles to roll in unintended directions, posing serious safety hazards;

b.      BMW intentionally concealed the Rollaway Defect from Plaintiffs and Subclass Members by omitting material information in advertisements, promotional

34

materials, and communications at the point of sale, despite knowing that this defect undermined the vehicles' safety and reliability;

c. BMW made incomplete and misleading representations about the safety and reliability of the Subclass Vehicles, highlighting advanced features such as the Driver's Assistance Professional package and promoting the vehicles as safe and reliable, while withholding critical facts about the Rollaway Defect that directly contradicted these assurances; and

d. The VCPA expressly and specifically required BMW to "clearly and unequivocally indicat[e] in [its] advertisement[s] and offer[s] for sale that the [BMW X1] [is] defective, . . . irregulars, imperfects, or 'not first class.'" Va. Code § 59.1-200(7). BMW failed to comply with this requirement by advertising the Subclass Vehicles as defect-free and first-class, despite knowing of the Rollaway Defect and the dangers it posed.

e. By concealing material information about the Rollaway Defect, BMW deprived Plaintiffs and Subclass Members of essential facts needed to make informed purchasing decisions. Plaintiffs and Subclass Members reasonably relied on BMW's omissions and representations, believing the Subclass Vehicles were safe and reliable, when in fact they were not.

130. Defendant intended that Plaintiffs and Subclass Members, in making their decisions to purchase, lease, and/or repair the Subclass Vehicles, would reasonably rely on BMW's representations and omissions regarding the quality, safety, and reliability of the vehicles. BMW's marketing materials, advertisements, and dealership communications emphasized the Subclass Vehicles' advanced safety features, smooth performance, and high-quality craftsmanship, creating consumer trust in the brand and its products. By failing to disclose the existence of the Rollaway

35

Defect and its associated risks, BMW concealed material information that contradicted these representations.

131.    BMW's failure to disclose and active concealment of the dangers and risks posed by the defective powertrains in the Subclass Vehicles were material to Plaintiffs and Subclass Members. The Rollaway Defect directly affected the vehicles' safety, reliability, and value, and any reasonable consumer would have considered these facts critical in deciding whether to purchase or lease a Subclass Vehicle. Had Plaintiffs and Subclass Members known about the Rollaway Defect and the associated safety risks, they would not have purchased or leased the Subclass Vehicles or would have paid significantly less for them.

132.    BMW's omissions contradicted Plaintiffs' and Subclass Members' reasonable expectations that the vehicles would perform safely and reliably as advertised. A vehicle manufactured by a reputable automaker known for safety and quality is inherently worth more than a vehicle with undisclosed defects that undermine its functionality and pose safety risks. By concealing the Rollaway Defect, BMW deprived Plaintiffs and Subclass Members of the benefit of their bargain, as they unknowingly paid for vehicles that were unsafe, unreliable, and diminished in value.

133.    BMW's misrepresentations, omissions, and failures to disclose material information regarding the Rollaway Defect caused Plaintiffs and Subclass Members to misunderstand the safety, reliability, and quality of the Subclass Vehicles. BMW's advertising materials, including its website and promotional content, consistently emphasized the advanced safety features and high performance of the Subclass Vehicles, creating the reasonable expectation that the vehicles were defect-free and safe to operate.

36

134.    Although BMW and its agents were aware that the Subclass Vehicles were equipped with a defective powertrains at the time that Plaintiff and the Subclass Members purchased or leased their Subclass Vehicles, BMW refused to provide a fix for these powertrains, free-of-charge in accord with the terms of its written warranty and to prevent the damages described herein.

135.    BMW's violations of the VCPA were intentional and willful because BMW engaged in a calculated campaign to protect its bottom line from damage caused by its mass marketing and sale of hundreds, if not thousands, of vehicles with defective, unsafe powertrains. BMW shifted the burden and costs of its failed transmission system onto consumers like Plaintiff and the Subclass Members instead of honoring its warranty obligations and purported commitment to safety.

136.    Plaintiffs and Subclass Members reasonably relied on BMW's explicit and implied assurances about the safety and reliability of the Subclass Vehicles. BMW's advertising materials and website prominently emphasized the vehicles' advanced safety features, including the Driver's Assistance Professional package, and touted the vehicles' high-quality engineering and performance. These assurances were further reinforced by dealership representatives, who promoted the Subclass Vehicles as safe, reliable, and defect-free.

137.    Plaintiffs specifically relied on these representations when deciding to purchase their vehicle, believing they were acquiring a product that met BMW's advertised standards of safety and reliability. For example, Plaintiffs were assured by BMW's promotional materials and dealership staff that the vehicle's safety systems, including features designed to assist in challenging driving conditions, were among the best in the industry. These representations, combined with BMW's failure to disclose the Rollaway Defect, created a reasonable expectation

37

that the Subclass Vehicles were free from defects that would compromise their safety and functionality.

138.    The conduct of Defendant offends public policy, as established by statutes and common law; is immoral, unethical, oppressive and/or unscrupulous and caused avoidable and substantial injury to Subclass Vehicle owners and lessees (who were unable to have reasonably avoided the injury due to no fault of their own) without any countervailing benefits to consumers.

139.    Plaintiffs and the Subclass Members have been damaged as a proximate result of Defendant's violations of the VCPA and have suffered damages as a direct and proximate result of purchasing or leasing defective Subclass Vehicles.

140.    As a direct and proximate result of BMW's violations of the VCPA, Plaintiffs and Subclass Members have suffered ascertainable losses, including but not limited to the diminished market value of their vehicles, the cost of safety features that were rendered unreliable by the Rollaway Defect, and the financial burden of ongoing vehicle maintenance and attempted repairs that failed to resolve the defect. Plaintiffs and Subclass Members also suffered emotional distress and significant inconvenience from the safety risks posed by the defect, which left them unable to safely rely on their vehicles for transportation.

141.    BMW's omissions and misrepresentations caused Plaintiffs and Subclass Members to unknowingly purchase or lease vehicles with a serious safety defect, depriving them of the benefit of their bargain. Plaintiffs and Subclass Members reasonably believed they were acquiring vehicles that met BMW's advertised standards of safety and reliability. However, the Rollaway Defect has rendered these vehicles unsafe and unreliable, requiring Plaintiffs and Subclass Members to incur financial and emotional costs to address a defect that BMW failed to disclose.

142.    Had Plaintiffs and Subclass Members known of the Rollaway Defect, they would not have purchased or leased the Subclass Vehicles or would have paid significantly less for them. Plaintiffs and Subclass Members continue to bear the financial and personal burdens of BMW's deceptive and unfair conduct.

143.    BMW's violations of the VCPA were intentional and willful. BMW had actual knowledge of the Rollaway Defect, as evidenced by internal defect bulletins referring to the issue as "B48 Transversal: Unfavorable Drive-Off Behavior," and consumer complaints received before the sale of the Subclass Vehicles. Despite this knowledge, BMW intentionally concealed the defect from Plaintiffs and Subclass Members, continuing to market and sell the vehicles as safe and reliable. BMW's deliberate decision to withhold critical safety information and its failure to provide an adequate remedy reflect a calculated effort to protect its financial interests at the expense of consumer safety and transparency. These willful actions caused substantial harm to Plaintiffs and Subclass Members.

144.    Alternatively, if BMW's violations of the VCPA are deemed non-willful, they were the result of BMW's negligence or lack of proper procedures to identify and disclose safety defects in a timely manner. BMW failed to implement adequate quality control measures to ensure that vehicles sold to consumers were free of dangerous defects. Additionally, BMW's warranty and repair practices were insufficient to address known issues, leaving Plaintiffs and Subclass Members with vehicles that were unsafe and unreliable. Regardless of intent, BMW's conduct deprived Plaintiffs and Subclass Members of fair and ethical consumer transactions and caused significant financial and emotional harm.

145.    Plaintiffs and Subclass Members are entitled to relief under Va. Code § 59.1-204(A), including actual damages, statutory damages, treble damages, and reasonable attorneys'

fees and costs. BMW's conduct, as detailed in this Complaint, directly violated multiple provisions of Va. Code § 59.1-200(A) by misrepresenting the safety and reliability of the Subclass Vehicles, concealing the Rollaway Defect, and failing to provide effective remedies.

146.    BMW's actions caused Plaintiffs and Subclass Members to incur substantial financial losses, including diminished vehicle value, costs for ineffective repairs, and expenses related to vehicles that failed to meet the advertised standards of safety and reliability. Additionally, Plaintiffs and Subclass Members suffered emotional distress and significant inconvenience caused by the safety risks associated with the Rollaway Defect.

147.    Because BMW's violations were willful, as evidenced by its internal knowledge of the defect and its intentional concealment of material facts, Plaintiffs and Subclass Members are entitled to treble damages as permitted under the VCPA. These enhanced damages are necessary to compensate Plaintiffs and Subclass Members for the full extent of their losses and to deter BMW from engaging in similar deceptive practices in the future.

**Count Four—Violation of Virginia Motor Vehicle Warranty Enforcement Act**

(Va. Code §§ 59.1-207.9, *et seq*.)
(Plaintiffs, individually)

148.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

149.    Plaintiffs bring this cause of action individually under the Virginia Motor Vehicle Warranty Enforcement Act, Va. Code §§ 59.1-207.9, *et seq*. ("Lemon Law").

150.    As individually defined in Va. Code § 59.1-207.11, *et seq*, Plaintiffs are "consumer[s]," BMW is a "manufacturer," the vehicle is a "motor vehicle," and the various defects in the vehicle constitute "nonconformities," "serious safety defects," and "significant impairments."

40

151.    Plaintiffs purchased the Vehicle on September 14, 2023.

152.    BMW and its agents failed to correct the nonconformities in Plaintiffs' vehicle after a reasonable number of repair attempts, significantly impairing its use, safety, and market value. Consistent with Va. Code § 59.1-207.11, Plaintiffs provided notice of the Rollaway Defect by sending a letter to BMW of America. Plaintiff also presented the vehicle to BMW's authorized dealership for service and repair on September 19, 2023, and December 7, 2023, consistent with Va. Code § 59.1-207.13(E).

153.    On September 19, 2023, these repair attempts included Defendant conducting a road test with the customer to replicate the issue of the vehicle rolling on an incline. Defendant performed a software update for the Dynamic Stability Control system and recalibrated both the DCT transmission and DSC sensors. BMW's authorized dealerships acted as agents for warranty purposes, and their communications with the manufacturer satisfy the Lemon Law's notice requirement.

154.    142.    On December 7, 2023, the Defendant investigated the issue again by performing diagnostics and reviewing BMW's Defect Bulletin "B48 Transversal: Unfavorable Drive-Off Behavior.", which Defendant attributed the behavior to DME software calibration. The issue was not fixed.

155.    Less than four months after Plaintiffs purchased the vehicle, on December 16, 2023, Plaintiffs returned the vehicle to the dealership for a third time, providing both sets of keys and expressing their intention to no longer take or retain possession of the defective vehicle.

156.    On February 15, 2024, BMW responded via letter to Ms. Berl claiming to have inspected the vehicle on January 8, 2024, and claimed to find no issues (See exhibit A). Defendant refused Plaintiffs' demand for all remedies to which they are entitled under the Lemon Law.

157.    BMW was already aware of the Rollaway Defect through its own internal defect bulletin titled "B48 Transversal: Unfavorable Drive-Off Behavior."

158.    This bulletin, which acknowledges the unsafe nature of the defect, demonstrates that BMW had constructive notice of the issue affecting Plaintiffs' vehicle and similar vehicles in the same model line. BMW also received numerous customer complaints and warranty repair data about the Rollaway Defect prior to Plaintiffs' purchase. This prior knowledge underscores BMW's failure to address the defect and renders any additional consumer notice redundant under the Lemon Law.

159.    Plaintiffs' vehicle has been subject to repair two or more occasions for a safety defect, and the defect has not been resolved. Additionally, the vehicle has been out of service for repair for a cumulative total of over 30 calendar days. Under Va. Code § 59.1-207.13(B), these facts establish a presumption of significant impairment and a reasonable number of repair attempts.

160.    As a consequence of BMW's violation of the Lemon Law, Plaintiffs have sustained damages, including diminished vehicle value, loss of use, and significant inconvenience. Plaintiffs have also incurred and will continue to incur expert witness fees, attorney's fees, and litigation costs to address BMW's refusal to comply with the Lemon Law.

161.    Plaintiffs are therefore entitled to relief pursuant to Va. Code §§ 59.1-207.11, 59.1-207.13, and 59.1-207.14, including a full refund of the vehicle's purchase price or a replacement vehicle, damages for diminished market value, loss of use damages, expert witness fees, and reasonable attorneys' fees and costs.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class and

Subclass proposed in this Complaint, respectfully request that the Court enter judgment in their

favor and against BMW, as follows:

a. Declaring that this action is a proper class action, certifying the Class and Subclass as requested herein, designating Plaintiff as Class and Subclass Representative and appointing the undersigned counsel as Class Counsel;

b. Ordering BMW to pay actual damages (and no less than the statutory minimum damages) and equitable monetary relief to Plaintiffs and the other members of the Class and Subclass;

c. Ordering BMW to provide specific compensation to Subclass Members who have incurred additional expenses as a direct result of the Rollaway Defect. This includes but is not limited to refunds for unused warranties, reimbursement of costs associated with failed repairs, and compensation for accident costs, vehicle storage fees, rental expenses, or alternative transportation costs;

d. Ordering BMW to pay treble damages, as allowable by the VCPA, to Plaintiffs and the other members of the Class and Subclass;

e. Ordering BMW to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiffs and the other members of the Class and Subclass;

f. Awarding injunctive relief as permitted by law or equity, including enjoining BMW from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective recall campaign;

g. Ordering BMW to provide ongoing disclosures to all current and future owners of Class Vehicles regarding the Rollaway Defect. These disclosures must include detailed information about the nature of the defect, potential safety risks, available remedies, and clear instructions on steps owners should take to mitigate risks associated with continued operation of the vehicles. BMW must also implement a monitoring program to prevent similar defects from occurring in future models;

h. Ordering BMW to pay attorneys' fees and litigation costs incurred by Plaintiff for the benefit of the Class and Subclass;

i. Ordering BMW to pay attorneys' fees, expert witness fees, and litigation costs incurred by Plaintiff in pursuing their individual claim.

j. Ordering BMW to pay both pre- and post-judgment interest on any amounts awarded; and

k.  Ordering such other and further relief as may be just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff, individually and all others similarly situated, hereby demand a trial by jury as to all matters so triable.

Dated:  November 22, 2024

Respectfully submitted,

**LAURA BERL**
**SETH BERL**

By_____*/s/ Drew D. Sarrett*_____
Drew D. Sarrett, VSB #81658
**CONSUMER LITIGATION ASSOCIATES, P.C.**
626 E. Broad Street, Suite 300
Richmond, Virginia 23219
Phone: (804) 905-9900
Facsimile: (757) 930-3662
Email: drew@clalegal.com

Leonard A. Bennett, VSB #37523
Craig C. Marchiando, VSB #89736
John Maravalli, VSB #99000
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email:  craig@clalegal.com
Email: john@clalegal.com

*Attorneys for Plaintiff and the Proposed Class*

45